GREGORIA AGOSTO, Plaintiff and Appellant, *v.* RAÚL JAVIERRE, Defendant and Appellee.

No. 10706.   Argued November 6, 1953.—Decided November 30, 1954.

---

*José M. Valentín* for appellant. *José J. Santiago* for appellee.

Opinion of MR. CHIEF JUSTICE SNYDER, in which MR. JUSTICE ORTIZ and MR. JUSTICE BELAVAL concur.

I am in complete agreement with the opinion of Mr. Justice Ortiz. For the reasons stated in his opinion, I am convinced that § 116 of the Civil Code was impliedly amended by Act No. 229 of 1942, as amended by Act No. 243 of 1945. It is true that in *Chabrán* v. *Méndez*, 74 P.R.R. 719, we held that § 116 barred a filiation suit by a child under facts substantially similar to those involved herein. But we erred in that portion of the *Chabrán* case precisely because there we did not consider the impact of Acts No. 229 and No. 243 on § 116.

In reply to the contention that we are engaging in judicial legislation in this case, I quote what we said in *Pérez* v. *District Court*, 69 P.R.R. 4, 17, footnote 5: " 'Judicial legislation' is a slippery phrase. It is frequently a semantic device used by those who do not like the result reached by a court engaged in the task of ascertaining the meaning of a statute. Those who find the result more pleasing call it 'judicial interpretation'." We added in *Compañía Popular* v. *Unión de Empleados*, 69 P.R.R. 167, 177, footnote 2: "The

label would therefore seem to depend on which result you prefer. We see no point in accepting either label. We confine ourselves to the difficult task of endeavouring to determine what the Legislature meant."

Stability in the law is eminently desirable. Indeed, when this Court concludes that it must reverse a prior case, it should reverse it only prospectively if contract or property rights are involved. See my dissenting opinion in *Arvelo* v. *Rodríguez*, 69 P.R.R. 149, at p. 157. But no one has a vested right in an error made by us in a previous filiation suit. *Cf. Pérez* v. *District Court, supra*, 16. In this field —perhaps above all others—we must be alert not only to correct our errors but also to apply the corrected rules to pending cases.

The rights of children born prior to July 25, 1952 are controlled exclusively by our statutes. Here again, as in the case of erroneous judicial decisions, no putative father has a vested right in unjust or ambiguous statutes, even though such statutes were in force at the date of conception or birth of the child. The instant case, *Figueroa* v. *Díaz*, 75 P.R.R. 152, *Armáiz* v. *Santamaría*, 75 P.R.R. 544, and other recent cases demonstrate the necessity for a comprehensive revision by the Legislative Assembly of the statutes relating to filiation which apply to children born prior to July 25, 1952. *Cf.* XXIII *Revista Jurídica de la Universidad de Puerto Rico* 258. I respectfully suggest that the Legislative Assembly give this sensitive subject its attention when it next convenes.

Opinion of Mr. Justice Negrón Fernández concurring with the result.

The natural children which in the decade from 1942 to 1952 were born of the adultery of married women now enjoy a false paradise erected on the debris of their dilapidated right. Today they find the doors open to contest their own legitimacy only to meet, a few steps ahead, the doors which,

as a result of the construction already placed upon Act No. 229 of May 12, 1942, bar the way to the investigation of their true paternity. I therefore believe that this case calls for pronouncements of greater juridical scope than those on which the opinion of Mr. Justice Ortiz is grounded, and paves the way for legitimate rectification of the juridical doctrine, prevailing in a number of our decisions, which narrows the exercise of the action of filiation of all natural children born under Act No. 229 to the strict patterns of § 125 of the Civil Code.

By necessary coincidence, the essential basis of Mr. Justice Ortiz's opinion is, in the limited ambit of the right to question legitimacy, the same juridical theory which, in the widest ambit of the intrinsic right to filiation, has been rejected by this Court: the amendment of the Civil Code provisions, heretofore inviolable, by the provisions of Act No. 229. Though tardy and incomplete, it is a laudable effort to give full expression to the evident purpose of social justice pursued by the legislation in question. In holding that § 116 of the Civil Code has been modified by the impact of Act No. 229, the juridical theory of the majority opinion recognizes, essentially but without giving it virtuality, the basic theory urged by me but previously defeated in *Figueroa* v. *Díaz*, 75 P.R.R. 152, personal opinion; *Armáiz* v. *Santamaría*, 75 P.R.R. 544, my dissenting opinion; and *Vargas* v. *Jusino*, 71 P.R.R. 362, my dissenting opinion at p. 369, in the sense that the action of filiation under Act No. 229 only requires evidence of paternity and is not confined to the restrictive provisions of § 125 of said Code. In my opinion, the flaw in our adverse authorities is their having attributed to the 1942 legislative reform—a time when the free world advances toward the full recognition of man's values—the same pattern of stoic human insensibility which characterized the right of illegitimate children three-quarters of a century ago.

The practical application of the juridical doctrine which permits a natural child—born of the illicit relations of a married woman during the operation of Act No. 229—to bring an action of filiation against his true father despite the status of legitimate child granted to him by the Civil Code, vanishes in a world of illusions when that action is subjected to the test of § 125 of the Civil Code. In claiming that he is not the child of the one who is alleged to be his legitimate father but of a third party who is his natural father under Act No. 229, the natural child will not truly have upon meeting that test "a judicial opportunity to prove that contention" if that "judicial opportunity", because of its uselessness, becomes in fact a total or quasi-total denial of actual opportunities to obtain the right claimed—the natural status of the father which is sought—*Figueroa* v. *Díaz*, my personal opinion, *supra*, which denial in turn creates the potential risk of forfeiting the right enjoyed—the legitimacy of the father which is disputed.

The obstacles which the lawmaker sought to overcome by the enactment of Act No. 229 must not produce more frustrations of filial rights, either by the effects of § 116 of the Civil Code as respects children born of the adultery of married women, or by the effects of § 125 as respects those and all other natural children born during the operation of said Act. The remedial purpose of that piece of legislation requires that the application of its provisions be based on the intrinsic realism of the law, and thus, by virtue of the inherent truth which they embody, we ought to witness, in full communion of its mutual values, "a humane interpretation of the law" [1] and the eminent social function of justice.

That is why, in concurring in the reversal of the judgment appealed from and signifying my conformity with the doctrine laid down in Mr. Justice Ortiz's opinion and which recognizes the minor's right to bring an action of filiation

---

[1] Term employed by Mr. Justice Jacinto Texidor y Alcalá del Olmo in *Stella* v. *District Court*, 41 P.R.R. 632, 640.

seeking his true father, notwithstanding his status of legitimate child under the Civil Code—by virtue and operation of Act No. 229—I do so with reservation as to some particulars which in my judgment were unnecessarily discussed in that opinion and I signify my disagreement as to others, particularly the need for amending the complaint, since in my opinion and according to my views in *Figueroa* v. *Díaz*, *supra*, the said complaint sets forth a cause of action of filiation which requires no amendment.

---

Opinion of MR. JUSTICE ORTIZ.

Gregoria Agosto, in representation of her son, Raúl Agosto, born on May 13, 1950,[1] filed in the San Juan Section of the former District Court of Puerto Rico an action for support against Raúl Javierre, on behalf of her son. After a hearing of the case on its merits, the San Juan Court rendered judgment dismissing the complaint on the ground that on the date of conception of the child and on the date of the trial, plaintiff was married to Rodolfo Rodríguez Meléndez, making it necessary to presume that the minor was the legitimate son of the said Rodolfo Rodríguez Meléndez; that since the claim for support alleges that the minor's father was the defendant and not plaintiff's husband, such claim entails an attack on the minor's legitimacy which can be contested only by the husband and not by the mother or the minor, in view of the provisions of §§ 113 and 116 of our Civil Code and of this Court's holding in *People* v. *Santiago*, 70 P.R.R. 798, and *Pérez* v. *Rosario*, 72 P.R.R. 480. Plaintiff appealed to this Court and prays that these cases be overruled.

---

[1] The words, formerly sacramental, that the mother appears "in representation of her son," are not expressly employed in the complaint. Such expression is unnecessary if it appears from the complaint that the action is actually for the benefit of the son and has been brought in his representation. *Maldonado* v. *Quetell*, 68 P.R.R. 390. The reality prevails over the technicality of words.

Section 113 of the Civil Code provides as follows:

"Legitimate children are those born 180 days after the marriage has been celebrated and before 300 days have passed after the marriage has been dissolved.

"Against legitimacy no other proof shall be admitted than the physical impossibility of the husband to use his wife within the first one hundred and twenty days of the three hundred days that have preceded the birth of the child."

Section 116 of the said Code reads as follows:

"Legitimacy can *only* be disputed *by the husband or his legitimate heirs*. The latter can only contest the legitimacy of a child in the following cases:

"1. If the husband has died before the termination of the period fixed for instituting his action in court.

"2. If he shall have died after presenting his action without having desisted from it.

"3. If the child was born after the death of the husband." (Italics ours.)

In *People* v. *Santiago, supra*, it was held as follows:

"Since § 116 of the Civil Code provides that the legitimacy of children can only be challenged by the husband and his legitimate heirs, the Legislature, by such enactment, eliminated all other persons or entities not mentioned in said Section, even the State itself. This being the declared public policy of the State in relation to that challenge, said public policy should not vary with the nature of the proceeding brought —civil or criminal—in which the question of legitimacy is raised."

In *Pérez* v. *Rosario, supra*, this Court held that:

"A married woman can not contest the legitimacy of her own child even accepting, without deciding, that her testimony as to the physical impossibility of the husband to have access to her within the 120 days of the 300 days that preceded the birth of the child were sufficient in a case contesting legitimacy as evidence against said legitimacy.

"A girl born 180 days after the marriage had been celebrated is presumed to be a legitimate child and the mother can not by herself overcome that presumption to make her a natural child by virtue of Act No. 229 of 1942 (Sess. Laws, p. 1296),

as amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 814)."

At p. 482 of the opinion it was stated as follows:

"The appellant argues besides that she testified that her husband had left for Saint Thomas and that, therefore, she proved the physical impossibility to have had access to her. Accepting without deciding that said testimony were sufficient in a case contesting legitimacy—*cf. Cubano v. Del Valle,* 69 P.R.R. 538—we would always be met with the fact that § 116 of the Civil Code, *supra,* does not authorize the wife to contest the legitimacy of her child."

A re-examination of the doctrine announced in the cases, *supra,* has convinced us that those cases must be overruled, particularly in view of the provisions, spirit, and new tonic of our recent legislation with respect to the rights of the children formerly known as "adulterine."

Let us consider first the situation prevailing in Spain, in whose Civil Code originated the concepts incorporated in §§ 113 and 116 of our Code. Section 108 of the basic Spanish Code corresponds substantially to our § 113. It appears from the Spanish §§ 111, 112, and 113 that the husband or his heirs, as the case may be, may contest the legitimacy of the minor born in wedlock. But even under those provisions, the Supreme Court of Spain held in a judgment rendered on March 20, 1919 (145 *Jurisprudencia Civil* 562) that the child himself, whose legitimacy is in dispute, may bring action to contest legitimacy and to set aside the corresponding certificate of legitimacy entered in the Civil Registry. In the opinion it is stated as follows:

"Whereas, the legitimacy of the children begotten during marriage, whether canonical or civil, produces the transcendental effects providently contained in our positive law, but not so when the direct filiation, instead of being licit and valid, is based on false and fictitious acts which, in open contravention of the law and morals, opens the avenue to certain persons to become descendants when actually they do not deserve that consideration in civil and juridical life;

"Whereas, the general theory is accepted that the child whose filiation, naturally extraneous to his will, is recorded in the Civil Registry with a paternity which does not legally belong to him, should be left free, if he is not to remain defenseless, to repudiate a presumptive birth which, although officially recorded, has merely a provisional character or carries a presumption which may be overcome in an adverse proceeding by other elements of proof;

"Whereas, the argument is worthless, because it is untenable, that the birth record can not be challenged because our Code does not authorize such challenge, since this kind of documents, when the contents are contradictory, merely certifies the date or day of recording but never, according to the prevailing authorities, the statements bearing on the parenthood therein contained, so that the silence of the law, if any, is not sufficient to warrant such a strict judgment which in many instances would contribute to missing the basis of a true personal status of filiation, and the confusion of the issue would destroy the stability and indissolubility of the marriage and, consequently, the ties of affection between parents and children as well as the paternal feelings, in detriment also to the public conscience represented by the State, which is called upon to intervene in the organization of the families in order that the natural and legitimate identification of the issue may be perpetuated without any deceit;

"Whereas, after an examination of the defect in the law, in the light of the rules of logical and equitable interpretation, it being a prerogative of the courts to supply legislative omissions and parsimony, it is not daring to affirm that the Code grants to plaintiff an identical right to contest the validity of an apparent title of filiation which her own nature repudiates, for in providing in § 118 that the child has during his lifetime the *right to claim* his legitimacy, this grammatical concept in common parlance comprises *a sensu contrario* the power *to challenge,* because in the light of its spirit it is as fair to claim something which is just as to contest that which is deemed unjust;

"Whereas, the same holds true with respect to the provisions of § 137 of the said legal Code in relation to § 135, which provisions grant to the natural child, after the father's death, as a means of protection, the right of action to claim his

acknowledgment before expiration of the first four years following majority;

"Whereas, the success of the appeal is neither assured by alleging therein the incompatibility between claiming and challenging at the same time two possessory statuses, such as the acknowledgment of a natural daughter and the legitimacy disclosed by the birth record, as if, notwithstanding the fact that the latter document represents a fact regarded as false, the juridical-personal effects of a false filiation could not be changed after a judicial debate that would tear down the entire system of the descendants born out of wedlock, or who have no personal status;

"Whereas, plaintiff, in an attempt to seek acknowledgment by the uninterrupted possession of the status of natural daughter, fails to investigate the paternity once these second-category descendants are permitted to prove the element of truth and certainty of the natural procreation;

"Whereas, notwithstanding the influence that the foregoing reasonings may have on the debate, nothing would be accomplished if the facts under discussion were not proved and, hence, the need for altering quasi literally the weighing by the Court, in which, contrary to the statements made in the certificate of the Civil Registry, which are denied by the presumptive father, it is declared that the birth of Francisca Juana took place at Murillo's domicile; that the delivery was made by Presentación Rodríguez and not by María de los Angeles; and that she was brought up by the father with whom she lived and who considered her as his own daughter to the point of letting her use his name publicly;

"Whereas, the weighing by the court, sole judge of the controversy, would also be practically worthless for the purposes of the appeal if the demurrers of prescription on which appellants rely were granted, both of which are inadmissible, the special one of § 113, because being, as it is, available against the husband and his heirs, it does not apply here; and that of § 1964, which is of a general character and applies to personal actions, since, as held by this Supreme Court, particularly in its judgment of the 22d last, the starting point of limitation must be counted as of Murillo's death, which is the date when his intention to give his minor daughter permanent possession of a civil status, as evidenced by direct and successive acts of

acknowledgment which belie his desire to exclude her from the paternal family, ceased to exist;

"Whereas, lastly, if in view of the foregoing it is inconceivable that plaintiff lacks a right of action to challenge a filiation other than the natural acknowledgment which, although inferior to the legitimate one, speaks the truth, in the opinion of the trial court, and if likewise there is no ground to consider that plaintiff's action has been defeated because her right has prescribed, it is evident that the two appeals taken from the Court's judgment cannot prosper in their entirety."

The latter opinion has been characterized as a preface to a "new rule, conclusive and fair, supplemental to the legal right in force." *Revista de Derecho Privado*, vol. 6, pp. 233, 234. We are in agreement with the rule laid down by the highest court of Spain in opening the judicial doors to an action brought by the child concerned, for the purpose of establishing the reality of its filiation.

It is well to clarify that the facts involved in the opinion cited are not identical with those in the case at bar. In the Spanish case the child was registered as the legitimate daughter of the spouses Roque Castellano Molero and María de los Angeles Rodríguez Durán, and she actually claimed that she was not the daughter of either of them but of Francisco Murillo Delgado, widower, and Presentación Rodríguez Durán. Hence, she was not the daughter of a married woman, as is the case here. However, there are at least two circumstances which, by analogy, render the Spanish case applicable to our case. In other words, it is stated in the opinion that the section of the Spanish Civil Code which fixes a period of limitation for contesting legitimacy, "is available only against the husband and his heirs," that is, that it was not applicable where a person other than the husband or his heirs brought action to establish the reality of the filiation, such action being available even if it involved an attack on legitimacy. In any event, the girl in question had an official status of legitimate daughter and the action

brought necessarily involved an attack on her legitimacy, and that was considered permissible by the Supreme Court of Spain. Another circumstance of utmost significance, which renders the Spanish case applicable here, is the fact that the child in that case was a natural daughter, since she was not the daughter of either of the spouses who registered her as their legitimate daughter, and her true parents could have married each other at the time of conception. The Supreme Court of Spain pointed out that, as such natural daughter, she had the right to bring an action of filiation and that the exercise of such right was to be protected even if it involved an attack on legitimacy. In the case before us, the child is, under the law, a natural and not an adulterine son, with the right to bring an action of filiation as a natural child, under the provisions of Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), as amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 814), and Act No. 448 of May 14, 1947 (Sess. Laws, p. 946), which govern the case at bar by reason of the fact that the child was born in 1950. We are therefore faced with that element of coincidence with the judgment of Spain, *supra*, as respects the status of natural child, wherein it is stated that the section which grants to the husband or his heirs the right to dispute legitimacy does not exclude the action of filiation of a natural child, regardless of whether such action involves an attack on legitimacy.

It is well, however, to point out a difference between § 116 of our Civil Code and the corresponding §§ 112 and 113 of the Spanish Code, which are worded so as to permit the husband or his heirs to bring the action to contest, though not exclusively, while our § 116 provides that legitimacy can be disputed *only* by the husband or his heirs. (The term "only" is not used in the Spanish section.) However, the apparent exclusiveness of § 116 lost its juridical validity and virtuality, its concrete effectiveness, and its rationale, and was modified and eliminated as such by Act No. 229 of May 12, 1942 as respects "adulterine" children born sub-

sequent thereto. The said Act No. 229 of 1942 provides in part as follows:

"Section 1.—All children born out of wedlock subsequent to the date this Act takes effect, shall be natural children, whether or not the parents could have married at the moment when such children were conceived. These children will be legitimized by the subsequent marriage of the parents, to each other.

".  .    .    .    .    .    .    .    .

"Section 3.—In no criminal or civil action against the father or mother who recognized a child who lacked the qualifications of a natural child, according to previous legislation, may the fact of such recognition be introduced as evidence, except in the case of an action filed by the child to claim his rights as such."

Under the provisions of that Act, the children formerly known as "adulterine," namely, when one of the parents was married to another person, which, it is contended, is the case of the minor in question, who are born after the said Act took effect, should be considered as natural children with all the corresponding inherent rights. A child formerly known as "adulterine," born subsequent to the effective date of said Act, has from the moment of his birth the status of a natural child *for all legal purposes*, irrespective of whether or not his parents could have married at the time of his conception. (*Cruz* v. *Andrini*, 66 P.R.R. 119, 123; *Montañez* v. *Rodríguez*, 67 P.R.R. 198; *Falcón* v. *Cruz*, 67 P.R.R. 496; *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938.) One of the legal effects of the status of natural child, and one of the rights inherent in such natural child, is the right to bring an action of filiation. A child of a married woman, born subsequent to May 12, 1942, claiming to be the natural child of a man other than the mother's husband, may bring action of filiation against his true father. The establishment of the status of natural child of the defendant necessarily leads to the conclusion that plaintiff is not the legitimate child of the husband of plaintiff's mother. The attack on legitimacy is implied in

the action of filiation, that is, the attack on legitimacy is an essential ingredient of the action of filiation. In blotting out the "stigma" of adulterine child and making him a natural child, Act No. 229 of 1942 grants the right to bring an action of filiation, which necessarily entails the right to contest legitimacy. Act No. 229 creates a new cause of action which did not exist theretofore. The creation of that new cause of action (of filiation and, consequently, to contest legitimacy) is a sequel to the new status of natural child recognized by Act No. 229. Before the operation of that Act, there was margin to decide that an adulterine child could not bring action of filiation. *Cortés v. Heirs of Solá,* 72 P.R.R. 585, 588. In view of that previous legislative situation, the provision of § 116 of the Civil Code to the effect that legitimacy can be disputed *only* by the husband or his heirs, was valid and effective. The adulterine child could not dispute legitimacy, particularly since he could not bring action of filiation in which legitimacy or lack thereof could be elucidated. But Act No. 229 of 1942 implies the pronouncement that the natural child may also contest his own legitimacy as an incident in the action of filiation granted to him under that Act. No longer is the husband or his heirs the only ones who can dispute the minor's legitimacy, but now the minor himself can also make the challenge in order to give meaning and validity to the action of filiation authorized by Act No. 229. Therefore, the limitation of exclusiveness contained in § 116 does not apply to the children born subsequent to Act No. 229 of 1942. The continuation of such exclusiveness would be incompatible with the action of filiation granted to such children by Act No. 229. The phrase "only by the husband or his legitimate heirs" has been implicitly, but necessarily, modified by Act No. 229. Section 116 of the Civil Code is a general provision congruent with the general treatment accorded to natural children in the Civil Code prior to 1942. Act No. 229 is a special law

which ought to prevail over the generality of § 116, according to the established rules of statutory construction. Act No. 229 creates a special new treatment in favor of the children formerly known as "adulterine," which entails a transformation in the prior general system. The special new categories entail the inapplicability of the old concepts, which responded to a situation different from that which emerged to legal life under Act No. 229.

From another point of view, modern legislation has granted valuable rights to the children formerly known as adulterine, born subsequent to May 12, 1942. Among those new attributes is the parity with the legitimate children as to hereditary rights, under the provisions of Act No. 448 of 1947. *Cortés* v. *Cortés*, 73 P.R.R. 643. In order that those children may have the opportunity to assert those rights, they should be allowed to take refuge in the proper judicial remedies. Where there is a wrong there is always a remedy. *Garcia* v. *Garcia*, 18 P.R.R. 926, wherein that maxim was applied for the benefit of a child seeking annulment of the record of his birth as a natural child. The judicial doors should not be hopelessly closed so as to deny access to the courts to those who claim to be entitled to substantive rights created by law. The new status of natural children given to the "adulterine" children should entail, as a sequence to their new rights, the opening of the judicial doors and the recognition of new opportunities in the courts to establish such status, even if such action involves an attack on legitimacy. Act No. 229 of 1942 widens the avenues leading to the truth and unlocks the doors which were barred by § 116. Under § 116, the husband or his heirs were the sole judges of the advisability of investigating the filial reality. The child, principal character in the drama, should be given the same opportunity to have access to the judicial stage where his own condition and his genuine status will be debated.

From the point of view of juridical logic and the rules of statutory construction, we reach the inescapable conclusion

that Act No. 229 of 1942, in granting an action of filiation to the "adulterine" children, impliedly modified the strict system of exclusiveness embodied in § 116. Let us consider now the problem from the historical and social viewpoint. It cannot be said that the term "only" (the husband or his heirs) employed in § 116 is a reflection of the Spanish Civil Code. As already stated, §§ 112 and 113 of the Spanish Civil Code, which cover the same field as our § 116, provide substantially that the husband or his heirs may bring action to contest the legitimacy within a certain limitation period, that is, they are given an opportunity to challenge legitimacy, but the said Spanish sections do not employ the term "only". It is in Louisiana and in California where the concept "only the husband or his heirs" has prevailed. *State* v. *Jones*, 1951, 56 So. 2d 724; *State* v. *Randall*, 53 So. 2d 689; *Jenkins* v. *Aetna Casualty Co.*, 158 So. 217, 5 *Tulane L. Rev.* 449; *In re Madalina*, 174 Cal. 693, 164 Pac. 348, 1 A.L.R. 1629; *Estate of Lee*, 200 Cal. 310, 253 Pac. 145; *Serway* v. *Galentine*, 170 P.2d 32; *González* v. *Pacific Greyhound Lines*, 1949 and 1950, 202 P.2d 135, 209 P.2d 598, 214 P.2d 809; 23 So. Cal. L. Rev. 538, 561 *et seq.* Apparently, the Louisiana and California rule was based on the Code Napoleon. We cannot overlook the fact that, as respects illegitimate children, the Code Napoleon was overly restrictive in prohibiting categorically the investigation of the paternity of illegitimate children, as a result of which it has been ruthlessly censured, § 340 of the French Civil Code having been finally amended in 1912 authorizing the investigation of paternity in a certain number of specific situations. 1 Manresa 630, 631 *et seq.*, 6th ed.; Colin y Capitant, *Derecho Civil*, vol. 1, pp. 621, 623 (2d ed., p. 602). It is significant to note that our § 116, literally construed, is more strict as to the action "En Désaveu" (to contest legitimacy, 23 So. Calif. L. Rev. 563), than the corresponding Spanish sections. We have followed the French, Louisiana, and California pat-

tern far beyond the Spanish rules. Incidentally, although the Roman law observed strict rules against illegitimate children (23 So. Cal. L. Rev. 544, 30 Col°. L. Rev. 308, 310), the early canon or ecclesiastical law was quite liberal as to permitting illegitimate children to establish their status, from the viewpoint of the essential equality of men, in their origin. 23 So. Cal. L. Rev. 546; Judgment of the Supreme Court of Spain of July 5, 1944, cited in Rodríguez Navarro's *Doctrina Civil del Tribunal Supremo*, p. 672. Under the common law, although since the 18th century the mother was forbidden to testify against the legitimacy of her children, under the Lord Mansfield rule (7 Wigmore 358, 360, § 2063, 3d ed., in which that rule is unmercifully and conclusively censured), however, the common law always permitted illegitimate children to bring action to contest legitimacy. 23 So. Cal. L. Rev. 562, 563; *Wright* v. *Hicks*, 56 Am. Dec. 451; 7 Am. Jur. 638. The Louisiana and California cases and authorities cited are based on statutory provisions analogous to our § 116, but in none of those jurisdictions has legislation been enacted such as our Act No. 229 of 1942, which changes the situation altogether.

The arguments offered in support of the theory that only the husband or his heirs may question the legitimacy of a child, and that the child cannot by himself bring action to dispute legitimacy, may be summed up as follows:

(1) To permit any person other than the husband or his heirs to question the legitimacy would jeopardize the integrity and sanctity of the marriage.

(2) The child should not be allowed to become his own instrument of destruction, that is, to destroy his own status of legitimacy; nor should the mother be permitted, through passionate impulses of the moment, or as a result of possible coercion by her husband, to attempt to question the legitimacy of her offspring.

(3) The husband should be the sole judge of his offended honor.

(4) The husband's heirs may have an opportunity to invoke judicial relief to declare the illegitimacy of the child concerned, in order to protect the hereditary rights of those claimants.

(5) The granting of authorization to bring action (En Désaveu) to other persons besides the husband or his heirs would pave the way to scandal and immorality.

The exposition itself of the contentions made is sufficient to show that they are unfounded. The essential theme, the latent and continuous motive, refers to the stigma and social blemish which is sought to be fastened upon "adulterine" children. In the commentaries on §§ 139 and 140 of the Spanish Civil Code, which correspond to our §§ 128 and 129, providing that the only right of adulterine children is to claim support, provided their status is established by final and unappealable judgment, it is stated in 3 Scaevola 429, 5th ed., as follows:

"The restrictive spirit underlying the legislations of all countries as respects illegitimate children is most evident in the case of the truly illegitimate ones, namely, those who are not natural, the true outcasts of social order. And this is truly the most adequate designation for them. The consideration which the different classes of children now have under the law and in society are in exact proportion to those enjoyed by the different Indian castes. Like in India, the Brahmans or priests were the noblest and most dignified, since, pursuant to the Laws of Manu, "among the intelligent human beings men come first and among the latter the Brahmans," so the legitimate children come first in the legal rank of filiation. Next come the legitimatized and then the natural children, who may well be placed on a par with the Kshatriyas as respects the order of preference, from the above point of view, and, lastly, the other illegitimate children who, like the Sudras, represent a lowly social class, which is looked upon with contempt by the other classes and almost entirely deprived of rights.

"These circumstances are particularly reflected in the question of the investigation of the paternity or maternity of

such children, which is repudiated in cruel and even offensive terms to the dignity of the latter by those who likewise reject it with respect to natural children. 'The acknowledgment of adulterine or incestuous children—says Bigot-Préameneu—presupposes, on the part of the father or mother, the confession of a crime,' and Lahary asks: Is there anything more immoral than to secure the protection of the law to a monstruous child who, in search of some support, would accuse his parents of begetting him through some criminal act or offense? This is the principal argument (this and no other word can be used) adduced against the investigation and which was responsible for its prohibition in the French Code (§§ 335 and 342), which, in our opinion, is not sufficient to warrant such prohibition.

"It is true that the investigation presupposes as basis the denunciation of a punishable act; but, have the enemies of such investigation forgotten that it is of social interest to uncover and punish every offense? Based on this same interest, do the legislations of civilized countries refuse to admit the public and popular character of the criminal action? Is this not what § 101 of our Law of Criminal Procedure says, as confirmed by § 270 of the same law in declaring that all Spanish citizens may complain, whether or not they have been offended by the crime? So, if any person in the full enjoyment of his civil rights may expose the existence of a crime, why deny it to the child who files a complaint, not for the sole and direct purpose of punishing the criminal act, but as a necessary and indispensable means to attain the civil status to which he is entitled? It is true that § 261 of the Law of Criminal Procedure, *supra,* exempts infants from the obligation to denounce, but the denouncement therein referred to has an exclusively criminal purpose—public accusation of a crime—and such is not the case in the investigation. Moreover, there are cases in which it is not necessary to denounce, much less to prove the crime, because it is already proven, as for example, in the case of abduction or rape, or crimes performed by a male who is married or bound by divine order, in which case Bigot-Préameneu's and Lahary's contention does not apply. Our Civil Code, realizing the justice and evidence of the latter reasoning, grants to the illegitimate child (case 2 of § 140) the right to support where the paternity or maternity is implied from a criminal prosecution.

"But what can in nowise be tolerated is Lahary's words branding as monstruous the illegitimate child (adulterine or incestuous). Who has ever thought of branding as criminal a child, innocent of his father's or mother's crime? Since when and by virtue of what principle should a person suffer the consequences, if not material, at least moral, of the crime committed by another person? Who is the monster here, the child that has been brought into this world arbitrarily and without his consent, as stated by Kant in explaining the basis of the right to support, or the father and mother who begot him impelled by a sacrilegious or criminal love? Does the child so abandoned by his parents, devoid of the support of which Lahary speaks so disdainfully, and which is indispensable to the physical and intellectual life of every man, deserve such epithets?"

Further on, it is stated in Scaevola, p. 434, as follows:

"The Code omits a case which it mentions with respect to natural children: the uninterrupted possession of the status of illegitimate child, which exists although it may seem otherwise, and which to our way of thinking the Code should have comprised. It often happens, unfortunately very often in our society, that a wife and husband who live separate and apart, either by divorce or in a conventional or friendly manner, have marital relations with his or her lover, bearing children who live with the parents and are supported and reared by them. Why should not these children, who enjoy the continuous status of illegitimate filiation in relation to their progenitors, whose paternity and maternity are evidenced by their acts, enjoy the right granted under § 139?"

Our modern legislation has eliminated the stigma and wiped out the blemish which fastened upon adulterine children by putting them on the same footing as natural and legitimate children. The rationale of the contentions in support of the postulate that only the husband or his heirs may contest legitimacy has therefore disappeared. Referring to the specific contentions that we have already pointed out, if claimant's allegations are true, the integrity of the marriage has already been impaired, as a matter of fact, by the adultery itself. Adultery must be properly punished in order to save the marriage. But, as stated in early canon law,

which was always in the vanguard to extol the virtues and protect the integrity of marriage, we must not depart from the theory of culpability in order to put the blame on the children alone for the consequences of the illicits acts of the parents. (Judgment of the Supreme Court of Spain of July 5, 1944, cited in Rodríguez Navarro, p. 672.) The important thing is to ascertain the reality of the facts surrounding the genuine filiation, and a spurious or false paternity or filiation should not be upheld on the basis of maintaining the artificial integrity of a marriage. On the other hand, the theory that the children must not be instruments of their own destruction presupposes the postulate, which has been eliminated by our modern legislation, that the fact of being an illegitimate child constitutes in itself a destruction of the personality. The theory that the husband should be the sole judge as to the proper moment to defend his "honor," is untenable. Without denying its possible individual virtuality, the concept of honor, as in the case at bar, should be no bar to the judicial investigation of the reality of the facts. The power to decide whether or not a court should determine the paternity or filiation should not rest exclusively with the husband or his heirs. As to the latter, their exclusive initiative to commence the action cannot be justified for the purpose of protecting their hereditary rights, since under the laws enacted in 1942 and subsequent years the hereditary rights of illegitimate children are the same as those enjoyed by the legitimate children. In any event, the property rights should not serve to exclude entirely the human rights. Regarding the alleged scandal or immorality involved, the lawmaker has already implicitly considered that the putting of "adulterine" children on the same footing with the natural children, and with the legitimate children as respects hereditary rights under Act No. 448 of 1947, does not constitute scandal or immorality.

We realize that we have censured the theoretical bases of § 116 of our Civil Code. In so doing, we do not propose

to legislate judicially or to substitute our criterion for that of the lawmaker. If no legislation on illegitimate children had been enacted in Puerto Rico in 1942 and thereafter, that is, if our attention were confined to § 116, we would be bound to impart effectiveness to the provision that "only" the husband or his heirs may dispute legitimacy, and to abide by the legislative will, irrespective of any possible criticism which might ensue. But we have expressed our general criterion on the social aspects of the problem, not for the purpose of rendering § 116 ineffective in an isolated fashion, but as a point of orientation and reference as to the impact on § 116 of Act No. 229 of 1942, as well as of subsequent laws, and as to the legislative intent which furnished inspiration to the enactment of those laws, namely, the modification of the concept of exclusiveness as to the attack on legitimacy, a necessary consequence of the recent laws which we have mentioned bearing on "adulterine" children born subsequent to Act No. 229 of 1942, which modification, we repeat, is founded on postulates of solid virtuality from the viewpoint of social interest and intrinsic justice. We are not judicially repealing § 116. What we do hold is that § 116, literally construed in the sense of creating a strict exclusiveness, available only to the husband or his heirs, is not applicable to "adulterine" children born subsequent to the effectiveness of Act No. 229 of 1942, since that Act, in creating a new cause of action of filiation in favor of those "illegitimate" children, grants them the power, essential and necessary to the action of filiation, to contest legitimacy. In other words, Act No. 229 creates another class of persons who may contest legitimacy, and in that respect it transcends and goes beyond the limits of exclusiveness established in § 116. The simple situation is that of a general law which enumerates certain groups of persons as possessors of a certain cause of action to contest legitimacy, and that of a subsequent special act which establishes another group of persons to whom the same right to contest is granted. What would constitute judicial

legislation would be to disregard or render invalid Act No. 229 of 1942. If we should hold that § 116 remains in full force as to its exclusiveness to the point of barring "adulterine" children from contesting legitimacy notwithstanding the provisions of Act No. 229, then the declaration that such children are natural would lack reality and practical validity since they could not successfully bring an action of filiation, inasmuch as they could not contest their legitimacy, which attack would be an essential requisite to the action of filiation. Act No. 229 would operate in the vacuum of uselessness. The new substantive rights created by that Act would be meaningless because of the lack of judicial remedies necessary to enforce them. The theory of the continuation of exclusiveness contained in § 116 would entail a practical judicial repeal of Act No. 229 of 1942. It is not incumbent on the courts to bar compliance with the legislative intent expressed in Act No. 229, of granting new opportunities, rights, and judicial remedies to the children formerly known as adulterine. The general arguments which we have offered in pointing out the flaws inherent in § 116 are in keeping with the atmosphere of profound social justice made manifest by Act No. 229.

It could be argued that Acts Nos. 229 of 1942 and 243 of 1945 apply only, according to their own terms, to children born out of wedlock, and that they are not therefore applicable to the case at bar wherein the mother was a married woman and the child was not born out of wedlock, as contended. This implies the theory that those Acts apply only to "adulterine" children of married fathers but not of married mothers. It is true that in the title and in § 1 of Act No. 229 it is stated that it is applicable to children "born out of wedlock." But it was precisely the purpose of Act No. 229 to cover adulterine children and to grant them more ample rights, thereby making them natural children. Section 1 provides that "All children born out of wedlock subsequent to the date this Act takes effect, shall be natural

children, *whether or not the parents could have married* at the moment when such children were conceived." (Italics ours.) The parents' inability to marry each other presupposes or includes the fact that one of the parents is married to another person, that is, that the child be adulterine, and becomes a natural child under § 1. Section 2 deals with children born out of wedlock prior to the enactment of the Act, and *who lacked the qualification of natural children according to previous legislation*, that is, that they were adulterine children. [The Act refers to all kinds of adulterine children.] No distinction is made between the child of a married woman or mother and a child of a married man or father. Where the law does not distinguish, we ought not to distinguish. It would be unreasonable and unfair to assume that the law, which is silent as respects distinctions, has sought to create discrimination by granting the benefits and rights of a natural child to the child of a married father, denying at the same time such benefits and rights to the child of a married mother. The Act must not be construed in the sense that there exists a conflict between the evident application of its provisions to adulterine children and the application to children born "out of wedlock." If such conflict exists, the terms of the Act would conflict with each other and be mutually exclusive. The Act would be neutralizing itself and granting and denying rights at the same time. It would be a useless law. The construction of a law should not go so far as to produce its total elimination, nor should it be construed as establishing discriminations which have not been expressed in the law itself. The most reasonable, fair, and consistent construction of the words "children born out of wedlock," for the purpose of giving effect to the purpose of the Act, would be to identify that concept with that of children who, *actually* are not legitimate, that is, that are *actually* born out of wedlock for the reason that one of the parents is married to another person. As a matter of law, those children could be considered as legitimate until such

time as an action contesting legitimacy is successfully brought. As a matter of law, they would be born "in wedlock," although, as a matter of fact, they are adulterine. The Act would not be applicable to legitimate children as a question of real fact, that is, when both parents are married to each other. But the Act does apply to adulterine children born out of wedlock for the reason that the two parents are not married to each other, namely, to children which are not begotten in marriage who, as a matter of fact, are born out of wedlock. This realistic interpretation harmonizes the different provisions of the Act, avoids conflicts and discriminations, and carries out in full the legislative purpose of protecting adulterine children, in keeping with the postulates of humanism, essential justice, and basic equality among all men.

We have not overlooked the fact that the instant case is, in its origin, an action for support and not an action of filiation, and that the cases overruled herein—*People* v. *Santiago, supra,* and *Pérez* v. *Rosario, supra*—were actions for support. But in this type of cases the dominant action must be filiation, and the claim for support must be considered as incidental to the action of filiation. In order that a claim for support against the true putative father, other than the mother's husband, may be successful, it is necessary to establish paternity, that is, the parent-child relationship between plaintiff and defendant. Such action necessarily entails an attack on the paternity of the mother's husband, that is, on the legitimacy. The destruction of an existing status of legitimacy is a necessary effect of the success of plaintiff's claim. It would be unreasonable to uphold plaintiff's right to support against the defendant, on the ground that the latter is plaintiff's father, and at the same time maintain plaintiff's status as legitimate son of the mother's husband. Plaintiff cannot have two fathers. Therefore, plaintiff's status as the legitimate child of the mother's husband would always have to be considered as destroyed. If the controversy

were confined to the right to support, plaintiff would lose his legitimacy status without establishing a new filiation, that is, without acquiring a new status. He would have no status. In order to prevent that socially undesirable consequence, the dominant action must be that of filiation, the right to support being an incidental consequence of the establishment of filiation. The basic proposition involved is the minor's filial relation and the identification of his true father. The right to support stems from the filiation, which must be previously established. Plaintiff's possible status as defendant's natural child entails the right to support as a consequence and not as the basic origin. Paternity does not stem from the right to support, but rather the latter stems from paternity. Before the enactment of Act No. 229, an adulterine child had the right to support only, while under this Act such child has all the rights of a natural child, his basic right being to establish his filiation. We see no reason to prevent us, in cases like the one at bar, from deciding the controversy in one single proceeding in which filiation is the dominant action. Therefore, upon remanding the case to the lower court, the parties, particularly the plaintiff, must amend their allegations in order that the case be brought as an action of filiation, together with pertinent evidence, the purpose of which shall be to prevent the minor's legal status from remaining in a vacuum. As a sequel to the foregoing norms, it is well to indicate, collaterally, that in cases such as this one, a criminal action of abandonment or for support should not be prosecuted, unless claimant's true filiation is established in a proper civil proceeding.

Even within the scope of a claim for support, which must be incidental to the action of filiation, as already held, § 116 should be no bar to the right to support, which is a consequence of the success of the filiation suit. Incidentally, §§ 128 and 129 of our Civil Code, which had full and unquestionable force prior to the enactment of Act No. 229 of 1942, provide as follows:

"Section 128.—The illegitimate children lacking the lawful qualification of natural children are only entitled to such support from their parents, as is described in section 143.

"Section 129.—The right to the support mentioned in the preceding section can only be exercised:

"1. Where the paternity or maternity is inferred from a final judgment rendered in a criminal or civil action.

"2. Where the paternity or maternity is shown by an indubitable document from the father or mother wherein the filiation is expressly recognized."

Those two sections correspond to §§ 139 and 140 of the Spanish Civil Code. The Spanish courts and commentators have construed those sections in the sense that an illegitimate child (not natural) cannot successfully bring an action for support unless *prior thereto* and before the action for support is filed, a final and unappealable judgment has been rendered from which paternity may be inferred. (Judgments of the Supreme Court of Spain of April 9, 1908; June 4, 1912; February 15, 1916, and June 23, 1919; 1 Manresa 655 *et seq.*, 6th ed. cor. and enl.) In speaking of a final and unappealable judgment in a civil proceeding, § 129 refers to a judgment rendered in an action contesting legitimacy (3 Scaevola, *Código Civil*, 5th ed. p. 432), that is, an action contesting legitimacy must have been successfully brought before the illegitimate child may claim support. That literal interpretation of the two sections in question is grounded on the theory, announced in the judgments of Spain referred to, that the lawmaker's intent was to restrict the rights of adulterine children to the point of prohibiting investigation of the paternity, except in the unusual instances enumerated in § 129, and to protect the legitimate family.

Even before the new liberal legislation was enacted in Puerto Rico, this Court, with ample and prophetic vision, had already broken the cruelly restrictive chains of the literality in the interpretation of § 129. In *Rivera v. Cardona*, 56 P.R.R. 786, it was held that a final judgment from which

paternity is inferred was not a prerequisite for the prosecution of an action for support, and that the judgment itself in the action for support was or is the judgment referred to in § 129.

As has already been seen, Act No. 229 of 1942 eliminated the category of adulterine children, making them natural children. Therefore, the rationale of §§ 128 and 129 of the Civil Code, which limit the rights of "adulterine" children to support whenever their paternity is inferred from a final judgment (which in Spain was considered as the judgment rendered in a previous proceeding contesting legitimacy), has disappeared. The rights of such children, formerly called "adulterine," are determined in the light of § 127 of our Civil Code dealing with the rights of natural children. It is evident that under § 127 it is not necessary, as a condition precedent to the acquisition of such rights, that paternity be inferred from a previous final judgment. The previous action contesting the legitimacy is clearly unnecessary. Such challenge now is incidental to the determination of filiation and to the acknowledgment, also incidental, of the right to support. From the statements made in the course of this opinion, the incidental power to dispute legitimacy was granted to children, formerly adulterine and now natural, by Act No. 229 of 1942.

It has already been held that the pleadings must be amended when this case is remanded to the lower court in order that the dominant action be that of filiation. It is well to point out also that Rodolfo Rodríguez Meléndez, husband of Gregoria Agosto, plaintiff-appellant herein, was not joined as a party to this action. This action for support, as has been seen, involves a challenge to the minor's legitimacy. Should that challenge meet with success, the minor could not be considered as Rodolfo Rodríguez Meléndez' child. Therefore, the judgment which may be rendered herein directly affects the essential interests and rights of the said Rodolfo

Rodríguez Meléndez, since his paternity of the minor could be overcome. The husband, Rodolfo Rodríguez Meléndez, is and must be an indispensable party to this action. An indispensable party is one whose presence is required in order that the court may make a final adjudication as to all persons involved, and is one who has such an interest in the controversy that judgment can not be rendered without affecting that interest or without leaving the controversy in such a situation that its determination, without the presence of that party, is inconsistent with equity and good conscience. *Ríos* v. *Mercado*, 73 P.R.R. 784; *People* v. *Henneman*, 61 P.R.R. 189. The absence of Rodolfo Rodríguez Meléndez as a party to this action would render invalid any judgment which may be entered. Therefore, the said Rodolfo Rodríguez Meléndez must be joined as a party in the lower court in order that the proceedings herein may be prosecuted.

It is to be further observed that, following the rule laid down in *Chabrán* v. *Méndez*, 74 P.R.R. 719, the lower court should appoint in the case at bar a guardian *ad litem* to represent the minor, in view of possible conflicting interests of the mother and the minor.

The judgment appealed from will be reversed and the case remanded to the lower court for further proceedings not inconsistent with this opinion.

---

MR. JUSTICE SIFRE with whom MR. JUSTICE MARRERO and MR. JUSTICE PÉREZ PIMENTEL concur, dissenting.

Mr. Justice Ortiz has reached the conclusion that under Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), as amended by Act No. 243 of 1945 (Sess. Laws, p. 814), "a child formerly known as 'adulterine,' born subsequent to the effective date of said Act," of a married mother, "has from the moment of his birth the status of a natural child" and the right to bring an action of filiation and, hence, to contest his legitimacy in order to obtain judgment declaring

that he is not the child of the mother's husband but the natural child of another man, notwithstanding § 116 of the Civil Code, according to which legitimacy can *only* be disputed by the husband or his legitimate heirs.

The provisions of that section were applied in *People* v. *Santiago,* 70 P.R.R. 798, in which it is stated that, "In enumerating those who may challenge the legitimacy, the Code, naturally, excluded those that it did not mention in said Section." In *Pérez* v. *Rosario,* 72 P.R.R. 480, we expressed the view that a daughter born in wedlock is presumed to be a legitimate child, and the mother herself can not overcome that presumption to make her a natural child by virtue of Act No. 229, as amended by Act No. 243 of 1945. My learned colleague invokes those principles but merely to repudiate them, "particularly in view of the provisions, spirit, and new tonic of our recent legislation," giving the erroneous impression that such legislation was not taken into account in the decision of the last of the afore-cited cases.

I am fully convinced that the doctrine announced in those decisions and recently sanctioned in *Chabrán* v. *Méndez,* 74 P.R.R. 719, is the correct one and not the doctrine announced by Mr. Justice Ortiz in his opinion, which is a sequel to a misinterpretation of Act No. 229.

The problem which the Legislature purported to meet by the enactment of that Act was the status and rights of children born out of wedlock. That was the problem with which it was concerned, and it was resolved by wiping out the differences between such children, which sprang from the different condition of their parents, including them all in the category of natural children. That and none other was the purpose of such legislation and it was achieved—there—by remedying a manifestly unfair situation—without the necessity of affecting "the family institution arising from marriage," and leaving "in existence" the status of the children

considered legitimate under the provisions of the Civil Code.[1] In order to bring within the category of natural children those who were not such before the enactment of the Act, *supra*, it was not necessary to alter the principles regulating matrimonial filiation, nor to undermine the safeguards which protect it.

According to § 113 of said Code, the children of a married mother, born 180 days after the celebration of the marriage and before 300 days following its dissolution, are legitimate and presumably the husband's children.[2]   As has been seen, only the latter or his legitimate heirs may contest the legitimate filiation.   Section 116.   Act No. 229 was enacted by the Legislature with knowledge of those precepts, and in providing in § 1 thereof that "All children *born out of wedlock* . . . shall be natural children," it was conscious of what it was doing, stating in unequivocal terms the intention of designating as such the children born out of wedlock but not those born in wedlock, and without any intention of modifying the norms of the Civil Code concerning the system of legitimate descent in order to grant to a child presumed to be legitimate the right to dispute his legitimacy.

I maintain that Act No. 229 did not repeal or amend the provisions of § § 113, 116, and other concordant sections of the Civil Code, according to which a child of a married mother is born with the status of legitimate child, which he preserves until it is overcome by the methods established in those provisions, and this can only be accomplished at the instance of the husband or his legitimate heirs, *inasmuch as those methods were not enlarged by the said Act.*

If the purpose of such Act was to undermine, with respect to children born subsequent to its effectiveness, the presumption of legitimacy consecrated in § 113, and that is one of the

---

[1] Annotations on the Civil Code by Dr. Luis Muñoz Morales, vol. 1, p. 407.

[2] Raúl Agosto's mother wedded Rodolfo Rodríguez Meléndez on January 18, 1945, and Raúl was born on May 13, 1950 while the marriage still subsisted.

inevitable consequences of my learned colleague's theory; if the intention had been to render inapplicable to such children the provisions of § 116, or to amend them so as to include them among those who may attack matrimonial filiation, there is no question that such purposes would have been expressly stated by legislating in clear terms in order to attain them, and by making in our positive law the adjustments necessary to avoid confusion and disagreement as to the juridical norms applicable to such a serious and delicate problem as the one under discussion. The failure to do so and the fact that the lawmaker merely provided in § 1 of Act No. 229 that "All children born out of wedlock . . . shall be natural children, whether or not the parents could have married at the moment when such children were conceived," proves, in my opinion, that the scope of that Act is that which I give to it and not that given by Mr. Justice Ortiz, which scope no doubt will be the source of serious conflicts for which the Legislature cannot be held responsible.

I repeat that the Act in question did not repeal or amend the aforesaid provisions of the Civil Code, either expressly or tacitly. There is no conflict between the former and the latter if Act No. 229 is construed in consonance with the legislative will. The conflict arises, and indeed very seriously, when that will is disregarded.

In view of the purpose of such legislation, I am of the opinion that it is applicable (1) to children who were natural before the effectiveness of the Act, (2) to those born of an unmarried mother, irrespective of the father's status or condition, (3) to the children of a married mother, whenever the legitimate filiation is excluded under the provisions of the Civil Code, which is seldom the case, since the mother's adultery is the exception.

That, in my opinion, is the proper interpretation of Act No. 229, and by such interpretation its provisions are not rendered invalid, much less eliminated, nor is any "conflict

between the evident application of its provisions" to adulterine children and "to children born out of wedlock" created, as erroneously contended by Mr. Justice Ortiz. Before the Act took effect, an adulterine child of an unmarried woman and a married father was a social outcast, a non-natural illegitimate child, and remained as such during his lifetime, and the child of a married mother was and remained in the same situation once his matrimonial filiation was destroyed. In view of the clear provisions of that Act, those children born subsequent to its effectiveness fall within the category of natural children, with all the rights granted to them under our legislation. However, in order that a child of a married mother may come within that category, he must first lose the status of legitimacy, which is only possible, I repeat, at the instance of the husband or his legitimate heirs. In view of the highly transcendental and practical consequences of the provisions of Act No. 229, I fail to see how it can be maintained that they lose their effectiveness if so construed, and even less that they become destroyed or eliminated.

My colleague Mr. Justice Ortiz disagrees with that construction. According to his way of thinking, "A child formerly known as 'adulterine,' born subsequent to the effective date of said Act, has from the moment of his birth the status of a natural child . . . ," whether born of a married mother, in view of the fact that no "distinction is made between the child of a married woman or mother and a child of a married man or father." Said magistrate believes that "It would be unreasonable and unfair to assume that the law, which is silent as respects distinctions, has sought to create discrimination by granting benefits and rights to the child of a married father, denying at the same time such benefits and rights to the child of a married mother." Hence, the conclusion that the latter, if held not to be the child of the mother's husband but of another man, may contest his legi-

timate paternity in a filiation suit seeking a declaration that he is not the child of the former but the natural child of the latter.

In the first place, it is error to assert that a child born subsequent to the effective date of Act No. 229, formerly known as adulterine, "has from the moment of his birth the status of a natural child." That child was and is born, under the law applicable here, with the status of a legitimate child and remains outside the scope of Act No. 229, because he is a child born *in* wedlock. In the second place, the Act distinguishes between the child of a married mother and the child of an unmarried woman, since it expressly refers to children born *out* of wedlock, who are not those born of a married mother, as long as they bear legitimate filiation. Once that filiation is destroyed by the means prescribed in the Civil Code, those children are adulterine and, in conformance with the Act, they then fall within the category of natural children, and have the same benefits and rights as other children. In other words, by the interpretation which Mr. Justice Ortiz attacks, no discrimination is established or made. The Act—and this is evident—does not deny to the children of a married mother, whose legitimacy has been excluded, the benefits and rights granted to the other children which come within its scope, but it certainly does not recognize any such rights and benefits as long as they enjoy the status of legitimacy. Lastly, the magistrate's argument that Act No. 229 must be construed as granting equal benefits and rights to children born of an unmarried mother and to those born of a married mother, proves conclusively that the theory on which his opinion is grounded is erroneous, a theory that is tantamount to holding that the rule of acknowledgment is the same for both.

Filiation is established by voluntary acknowledgment or by the exercise of the action for compulsory acknowledgment. It is a general principle that children who cannot be volun-

tarily acknowledged cannot bring action for compulsory acknowledgment. Section 125 of the Civil Code provides that a natural child may be voluntarily recognized by the father and the mother jointly, or by one of them only, and further, that the latter are obliged to do so in the cases enumerated in that section, which, according to the conclusion reached by Mr. Justice Ortiz in *Figueroa* v. *Díaz*, 75 P.R.R. 152, from which only Mr. Justice Negrón Fernández and Mr. Justice Belaval dissented, remained in full force "as to the requirements of proof contained therein," the precepts thereof being applicable "to actions of filiation brought by natural children born subsequent to the effective date" of Act No. 229, which criterion agrees with that expressed by Dr. Luis Muñoz Morales in his Annotations on the Civil Code, Vol. 1, p. 407, where he states that by virtue of that Act the first paragraph of that section, which provided that "Natural children are those born out of wedlock, from parents who, at the moment when such children were conceived, could have intermarried with or without dispensation," should be regarded as amended so as to provide that "Natural children are those born out of wedlock, whether or not the parents could have intermarried at the moment such children were conceived or born," the other provisions remaining unaltered. One of such provisions is, as noted, the voluntary acknowledgment of a natural child by the father or mother, jointly or individually.

Construing Act No. 229 as does my distinguished colleague, that is, in the sense of establishing no distinction between the children of a married mother, who are claimed to be adulterine, and the children of an unmarried mother, and of granting them equal benefits and rights, we would be faced with the juridical absurdity that a mother could voluntarily acknowledge as natural a child whose paternity is assigned by law to the husband, either jointly with him who is deemed to be the father, or by herself individually, thereby

tending to destroy the matrimonial filiation, without the intervention of the husband, the child, or the courts, and depriving the former of the legitimate paternity, and the child, "principal character in the drama," according to said magistrate, of the status of legitimacy, which would be at the mother's mercy, in order to give him the status of natural child, which alteration of status Mr. Justice Ortiz apparently regards as a *benefit*. In fact, the status of legitimacy and the safeguards around it would be practically worthless, and the marriage institution, which did not cease to be the normal basis of the family by the enactment of the Act in question, would be impaired.

If it is not possible to admit the absurdity of the voluntary acknowledgment of the child of a married mother as long as he bears the matrimonial filiation, it seems to me that we must inescapably conclude that it is erroneous to hold that the rules of acknowledgment are the same for that child and for a child born of an unmarried woman, it being likewise erroneous to say that both enjoy the same benefits, and that the former, which cannot be voluntarily acknowledged, has the right to bring an action of filiation to be declared natural child of a man other than the mother's husband, and contending that he is not the child of the man held by the law to be the father. I repeat that the argument presented on the so-called equal benefits and rights among natural children, according to the construction given by Mr. Justice Ortiz to Act No. 229, proves conclusively that such construction is erroneous altogether.

The conclusion reached by said magistrate is predicated on more than one theory, as I intend to prove. I have treated them as a whole and now I shall refer to some of them in particular.

It is contended that "Act No. 229 creates a new category of persons who may contest legitimacy, and in that respect it transcends and goes beyond the limits of exclusiveness es-

tablished in § 116 of the Civil Code." No, this Act merely reaffirmed that those who were natural children prior to its effectiveness are still natural children, and includes in that category the children born subsequent thereto who previously had the status of non-natural illegitimate children. It certainly did not create "a new category of persons who may contest legitimacy," since, as I have repeatedly said, there was no purpose, nor can one be inferred, to modify the norms of our positive law bearing on the challenge of legitimate filiation.

It is further contended that we are dealing with a "simple situation . . . of a general law which enumerates certain groups of persons as possessors of a certain cause of action to contest legitimacy" (I presume that he refers to § 116 of the Civil Code), "and that of a special Act [Act 229] which establishes another group of persons [the children] to whom the same right to contest is granted." I have already shown that no such right is recognized to these children. It is a gross error to say that Act No. 229 *is a special statute*. It is not; neither is § 125 of the Civil Code, the provisions of which, coupled with those of Act No. 229, lay down the rules for the acknowledgment of natural children. *Figueroa* v. *Díaz, supra*. If the provisions of that section are of a general character—this is admitted by my learned colleague—I fail to see why he says that those of Act No. 229 are not.

It is contended that "The most reasonable, fair, and consistent construction of the words 'children born out of wedlock,' for the purpose of giving effect to the purpose of the Act, would be to identify that concept with that of children who, *actually*, are not legitimate, that is, that are *actually* born out of wedlock for the reason that one of the parents is married to another person," and that "as a matter of law, those children *could be* considered as legitimate until such time as an action contesting legitimacy is successfully brought." (Italics ours.) As to the children of an

unmarried woman and a married father, there is no problem since the status of legitimacy is not involved. As to the child of a married mother, there is no question that if, as a matter of fact, he is found to be adulterine, he may seek protection under Act No. 229, but that fact cannot be established by the child. I cannot grasp what is meant when it is stated that the children of a married mother could be considered as legitimate. It is not that they *could be;* they must be considered as such, unless the status of legitimacy with which those children are born is disregarded, in violation of crystal-clear precepts, depriving them of one of their greater guarantees, sanctioned and respected by the laws of a great majority of the civilized nations.

Mr. Justice Ortiz claims that Act No. 229 impliedly amended § 116 of the Civil Code, enlarging it so as to include children among those who may contest the matrimonial filiation. It seems that I already proved that this is not so. I wish to add that that theory is in conflict with the previous theories, according to which *that section is not applicable* to children born subsequent to the effective date of said Act.

It is contended that "In view of that previous legislative situation [prior to Act No. 229], the provision of § 116 of the Civil Code to the effect that legitimacy can be disputed only by the husband or his heirs, was valid and effective," in which case the adulterine child could not attack it "particularly since he could not bring action of filiation...," while "Act No. 229 of 1942 implies the pronouncement that the natural child may also contest his own legitimacy." Where is that pronouncement? I insist that it cannot be found. The provisions of said section, dealing with the system of legitimate descent, had no such motivation. They exist in our law for other very transcendental reasons.

My distinguished colleague says that "Act No. 229... widens the avenues leading to the truth and unlocks the doors which were barred by § 116." In *Figueroa* v. *Díaz, supra,*

he did not contend that the Act had widened the avenues and unlocked the doors to reach the truth that a natural child has the right to compulsory acknowledgment. To what truth does he refers now? Evidently to what he calls "filial reality." If this is so, *that reality*, as to children born of a married mother, is that they hold the personal status of legitimate children until such time as that reality ceases to exist, at the instance of those entitled to dispute it.

I have little to say about the judgment of March 20, 1919 of the Supreme Court of Spain. I believe it is inapplicable, among other reasons, because the facts and circumstances which that Court had under consideration are entirely different from those involved in the instant case. If I were wrong in so holding, I would not be so in saying that that isolated and single judgment should not have been taken as a precedent to overrule the doctrine laid down in our decisions. Furthermore, since it is held by Mr. Justice Ortiz, among other theories, that § 116 of the Civil Code was impliedly amended by Act No. 229 in order to give the child the right to contest his legitimacy, I see no reason for invoking that judgment.

I regret that the majority of the Court now retracts its unanimous opinion in *Chabrán* v. *Méndez, supra*, decided on April 24, 1953.[3] We then stated that we must bear "in mind that under § 116 of the Civil Code only the husband or his legitimate heirs may challenge the legitimacy of the child," citing with approval the holding in *People* v. *Santiago, supra*. We also stated that "the Legislature has placed a roadlock in her [the child's] path—§ 116 of the Civil Code. The child therefore cannot pursue the matter any further unless and until the legitimate heirs of Frank Chaulón take some action under § 116." We added, referring to the social problem therein involved which in part is also involved in this suit,

---

[3] The child in *Chabrán* v. *Méndez, supra*, was born after the enactment of the 1942 and 1945 legislation.

and which we then characterized as "highly sensitive," that "the Legislature has erected a number of safeguards, as embodied in § 116 and other sections of the Civil Code." [4] These safeguards have been destroyed without any justification, and an altogether correct doctrine has been set aside in order to adopt in its place one which is manifestly erroneous.

The judgment appealed from should have been affirmed as conforming to law.

---

[4] I concurred with those statements being fully aware of the existence of Act No. 229.